## EXHIBIT A

## AFFIDAVIT OF SPECIAL AGENT EUGENE M. DIFIORE

I, Special Agent Eugene M. DiFiore, being duly sworn, do hereby depose and state as follows:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been employed in that capacity for approximately twelve years. I am currently assigned to the Logan Airport Task Force ("LATF"), based at Logan International Airport in East Boston, Massachusetts. The LATF is comprised of police officers from the Massachusetts State Police ("MSP"), and special agents from Homeland Security Investigations and the DEA. The mission of the LATF is to prevent the flow and transport of illegal narcotics and bulk United States currency related to the sale of narcotics, using the resources of the participating law enforcement agencies.

2. Prior to my employment with the DEA, I was employed as a police officer with the Methuen Police Department in Methuen, Massachusetts, from 1995 to 1999. I also served as a police officer with the Amesbury Police Department in Amesbury, Massachusetts, beginning in 1999, until I accepted a position as a criminal investigator with the DEA in 2005.

3. Through prior investigations and training, I have become familiar with the methods, language, and terms that are used to disguise the source and nature of illegal narcotics activities. I have conducted or assisted in a number of narcotics investigations. I have testified in criminal trials, in both federal and state courts, as a result of my involvement in those investigations. I have also applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

4.   I submit this affidavit in support of a Complaint for Forfeiture *In Rem* against the following property:

> $27,309 in United States currency seized from Josue Febo Soto at Boston Logan International Airport on March 10, 2017 (the "Currency").

5.   This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Currency.

6.   This affidavit is based upon my personal knowledge, training, and experience, as well as information provided to me by law enforcement personnel involved in the investigation, and my review of records and reports relating to the investigation.

7.   As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

## Background of Investigation

8.   On March 10, 2017, Ashley Ramirez ("Ramirez") booked an airline reservation for Josue Febo Soto ("Soto") on Jet Blue Airways Flight #961 from Boston, Massachusetts to San Juan, Puerto Rico. Flight #96 was scheduled to depart at 11:38 p.m. that same evening, and Ramirez booked the reservation in Soto's name less than twelve hours before the flight's anticipated departure time. Through my training and experience, I have become familiar with

flights between Boston and San Juan, which is a commonly chosen travel route for individuals engaged in illegal trafficking of narcotics and bulk currency.

9. Soto has been the subject of several DEA investigations. In 2005, Soto was convicted of Possession to Distribute a Class A Substance (Heroin) in Massachusetts' state court. He was sentenced to two years, six months committed, the balance to be suspended. Soto's probation was later revoked, and Soto was committed to serve the balance of his sentence.

10. In February 2012, the DEA investigated Soto (a/k/a "Sway"), and others, who were suspected of trafficking heroin from J&S Auto Workz ("J&S Auto"), a body shop located in Abington, Massachusetts. Soto and Santo Yera ("Yera") owned J&S Auto. The DEA suspected that they used this business to receive approximately 400 to 500 grams of heroin every week from an unidentified source of supply. Soto and Yera were suspected of distributing heroin from inside J&S Auto, in quantities ranging from 5 grams to as much as 100 grams at a time. Soto allegedly charged $320 per half finger (5 grams of heroin), and $600 per finger (10 grams of heroin). That investigation was closed. In 2016, however, Yera was arrested after execution of a federal search warrant at his residence, where approximately 250 grams of cocaine was seized. Yera was charged with Conspiracy to Distribute Cocaine and Cocaine Base. The case is pending in the United States District Court, District of Massachusetts. *See United States v. Rivera, et al.,* Criminal No. 16-10166-PBS (D. Mass.).

11. In December 2013, the DEA again investigated Soto for suspected distribution of heroin from J&S Auto. During the investigation, Soto was believed to have ties to addresses from which heroin was sold and used as "stash" locations. During this investigation, Johan Baez ("Baez") was identified as one of Soto's associates in furtherance of Soto's suspected heroin distribution. Baez was arrested in March 2014 during execution of a state search warrant at his

home, where law enforcement officers seized heroin that was packaged for distribution, a digital scale, and assorted packaging materials.

## Seizure of the Currency

12. With knowledge of the information set forth above, on March 10, 2017, at approximately 9:40 p.m., almost two hours before the scheduled departure of Soto's flight, I arrived at Jet Blue Airways Terminal C, along with other members of the LATF. At approximately 10:35 p.m., I saw Soto arrive in a blue Toyota Highlander, bearing Massachusetts registration BC23BR. I later identified Damarie Soto, Soto's aunt, as the registered owner of the vehicle through Registry of Motor Vehicles records. Approximately forty (40) minutes before Soto's flight, and twenty (20) minutes before boarding was to begin, Soto went inside the terminal and through the Transportation Security Administration ("TSA") security check point. Through my training and experience, I am aware that individuals acting in furtherance of criminal activities prefer to limit the time spent on airport property in an attempt to evade detection by law enforcement.

13. After Soto cleared the security check point, I approached him with Massachusetts State Police Trooper Christopher Fraser ("Trooper Fraser"). We introduced ourselves to Soto, told him that he was free to leave at any time, and that he was not obligated to speak with us. Soto agreed to speak with us.

14. When I asked Soto about his travel plans, Soto said he arrived in Massachusetts from Puerto Rico the night before, on March 9, 2017, at approximately 11:00 p.m., which I later confirmed. Soto told me that he was in Boston for a court appearance and that he had to appear in Brockton District Court as a witness to an assault. He stated that his uncle, Javier Santana, had been stabbed in an altercation, and that he testified the morning of March 10, 2017 about

4

what he witnessed during the altercation involving his uncle. However, Soto could not recall the prosecutor's name, nor could he produce a summons, or provide any material relating to his court appearance. When I asked Soto why he had nothing to show us relating to his court appearance for that morning, he said that his personal attorney, "Krowski," told him to go to court. Because I was unsure what Soto was trying to convey to me, I asked him to clarify his statements, but he did not. Later, I contacted the Plymouth County District Attorney's Office in Brockton, Massachusetts, and I learned that there were no records of Soto being summonsed as a witness. Additionally, I learned that there was no record of Javier Santana being a victim of a crime.

15.   I asked Soto where he stayed when he was in Boston, and Soto said that he stayed with family in Brockton, Massachusetts; specifically, Damarie Soto, who is his aunt. Soto told me he was headed to Puerto Rico to go home, and that he moved to Puerto Rico approximately one year ago. When I asked Soto about his employment, he said that he was currently unemployed, but that he recently sold his automotive shop, Robert's Auto Body, located in Brockton, Massachusetts. Soto said that he purchased the business seven years ago for $7,000, and was in the process of selling it for $36,000. Soto added that for as long as he owned the business, his name was not associated with its ownership, but now that he was selling the business, he wanted his name on the appropriate documentation of ownership. I asked Soto whether he had filed income tax returns, and Soto admitted that he had not. Soto also stated that he paid himself with business proceeds. Later, I attempted to verify Soto's claim of ownership and called Robert's Auto Body. A man who identified himself as Yera answered the telephone number for the business, and when I asked who owned the business, Yera told me that Robert's Auto Body was owned by Robert Pellegrino.

16. I asked Soto if he was in possession of any illegal narcotics, weapons, or large amounts of cash. Soto said that he had approximately $6,000 in United States currency in his possession, pointed to his carry-on bag, and said "It's in there." Trooper Fraser and I asked Soto for consent to search his carry-on bag, and he said "go ahead, look." Inside Soto's bag was a single stack of United States currency, consisting of mixed denominations, wrapped with a rubber band. Next to the currency was a small, black flip cellular phone. Soto also had another cellular smart phone with him. When I asked Soto why he had two telephones, he said that he had the flip phone until his new smart phone came in. Based upon my training and experience, I am aware that individuals involved in drug trafficking often use multiple cellular telephones in order to avoid law enforcement detection.

17. As Trooper Fraser and I spoke with Soto, Special Agent David O'Neill ("SA O'Neill") and Massachusetts State Police Trooper David Walsh ("Trooper Walsh") located Soto's checked baggage in the Jet Blue baggage room. I asked Soto for consent to search his checked bag, which he gave. I asked SA O'Neill to bring Soto's checked bag from the baggage room to Terminal C, and when the bag arrived, we asked Soto for permission to check his bag, and he provided consent.

18. Again, I reiterated that he was not under arrest and free to do leave at any point in time. While SA O'Neill and Trooper Walsh looked inside of Soto's checked bag, Soto spoke to someone I believe was his attorney, told him what was happening, and the call ended quickly. SA O'Neill and Trooper Walsh found three separate bundles of United States currency in mixed denominations, and wrapped in rubber bands in Soto's checked bag. When we showed Soto the currency, he shrugged his shoulders, then said that he had a total of approximately $20,000 in United States currency in his possession. Soto said he brought the initial $6,000 in United States

currency in his carry-on bag with him from Puerto Rico. He said the remaining $14,000 in United States currency came from an insurance payout for his totaled vehicle. When I asked Soto why he did not tell me before about the $14,000 in United States currency in his checked baggage, Soto shrugged his shoulders, mumbled, and did not say anything else.

19. I told Soto that the Currency would be seized pending further investigation and that he could go to the Massachusetts State Police ("MSP") – Troop F Barracks (the "Barracks") to receive a signed receipt for the Currency of he could continue his travel. Soto said he wanted to go to the Barracks.

20. At the Barracks, I asked Soto why he brought $6,000 from Puerto Rico to Massachusetts, only to bring it back to Puerto Rico less than twenty-four hours later. Soto replied that it was his money, and he wanted to keep it with him. He said that he collected the remaining currency that day (March 10, 2017) in Brockton. Soto said that his aunt, Damarie Soto, crashed his 2009 Mercedes Benz a couple of months before, and she recently received the insurance check. Soto said that his aunt was the registered owner and insured party on the vehicle, but that he was actually the owner. I asked to see documentation, but Soto could not provide any bank information regarding the cashed check or title of ownership. He said that he accompanied his aunt to a Bank of America branch in Brocton, and his aunt cashed the insurance check. Soto said that the insurance check was for "thirty something thousand dollars." When I asked Soto further questions about the insurance check, Soto said that he was done talking, and wanted to leave after he received a receipt for the seized Currency.

21. I later reviewed documents from Commerce Insurance Company. On January 12, 2017, Commerce Insurance Company issued a check made payable to Damarie Soto in the amount of $25,892.59 for a collision that happened on December 22, 2016. Records indicate the

vehicle involved in the accident was a 2008 Mercedes, and that Damarie Soto was the registered owner of the vehicle.

22. I requested assistance from a MSP Unit with a canine certified in narcotics detection to examine the Currency. Prior to the MSP's arrival, Trooper Fraser placed the Currency in a randomly selected location in the Detective Unit located on the second floor office space in the Barracks.

23. MSP Trooper Daniel Purtell ("Trooper Purtell") and his canine partner, Neko, responded to the Barracks. Trooper Purtell has been employed by the MSP for 11 years, and has been assigned to the MSP canine unit for three years. Maximus is a five-year old Dutch Shepherd trained in the detection of narcotics odor. Trooper Purtell uses Neko in the detection of controlled substances in different situations including interdiction investigations. In September 2013, Trooper Purtell and Neko attended and successfully completed a 320-hour course in narcotics detection through the New England State Police Administrators Conference ("NESPAC"). As a result, Neko is certified to detect marijuana, cocaine, heroin, and methamphetamine. Trooper Purtell and Neko attend recertification on a yearly basis. Their most recent certification was completed on May 24, 2016. Since the initial NESPAC accreditation course, Trooper Purtell and Neko have maintained their training at a minimum of 16 course hours per month. Searches conducted by Neko have led to the seizure of marijuana, cocaine, heroin, and methamphetamine.

24. When Trooper Purtell and Neko arrived to the Barracks, they searched the office space where the Currency was located. Trooper Purtell told Trooper Fraser that Neko alerted to the odor of narcotics on the Currency.

25. The Currency seized from Soto totaled $27,309, as follows: 19 one-dollar bills, 35 five-dollar bills, 51 ten-dollar bills, 1,095 twenty-dollar bills, 42 fifty-dollar bills, and 26 one hundred-dollar bills. The Currency was transported to Citizens Bank, where it was counted and deposited.

## Conclusion

26. Based upon the information set forth above, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

Signed under the pains and penalties of perjury this __18th__ day of August, 2017.

_____
Eugene M. DiFiore, Special Agent
United States Drug Enforcement Administration